IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

DAVID KREGER,

                 Plaintiff,

    v.                            Case No. 14-1332-RDR

SOCIAL SECURITY
ADMINISTRATION, Carolyn
W. Colvin, Acting Commissioner,

                 Defendant.

**MEMORANDUM AND ORDER**

On November 15, 2011, plaintiff filed applications for social security disability insurance benefits and supplemental security income benefits. These applications alleged a disability onset date of May 16, 2002. On May 22, 2013, a hearing was conducted upon plaintiff's applications. The administrative law judge (ALJ) considered the evidence and decided on June 10, 2013 that plaintiff was not qualified to receive benefits. This decision has been adopted by defendant. This case is now before the court upon plaintiff's motion to reverse and remand the decision to deny plaintiff's applications for benefits. As explained below, the court finds that plaintiff's motion should be granted as to plaintiff's application for supplemental security income benefits because the ALJ failed to properly weigh the doctors' opinions in this

matter in light of evidence which developed after the opinions were written.

I.  STANDARD OF REVIEW

To qualify for disability benefits, a claimant must establish that he or she was "disabled" under the Social Security Act, 42 U.S.C. § 423(a)(1)(E), during the time when the claimant had "insured status" under the Social Security program. See Potter v. Secretary of Health & Human Services, 905 F.2d 1346, 1347 (10th Cir. 1990); 20 C.F.R. §§ 404.130, 404.131.  To be "disabled" means that the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

For supplemental security income claims, a claimant becomes eligible in the first month where he or she is both disabled and has an application on file.  20 C.F.R. §§ 416.202-03, 416.330, 416.335.

The court must affirm the ALJ's decision if it is supported by substantial evidence and if the ALJ applied the proper legal standards.  Rebeck v. Barnhart, 317 F.Supp.2d 1263, 1271 (D.Kan. 2004).  "Substantial evidence" is "more than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id., quoting Richardson

v. Perales, 402 U.S. 389, 401 (1971).  The court must examine the record as a whole, including whatever in the record fairly detracts from the weight of the defendant's decision, and on that basis decide if substantial evidence supports the defendant's decision.  Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994) (quoting Casias v. Secretary of Health & Human Services, 933 F.2d 799, 800-01 (10th Cir. 1991)).  The court may not reverse the defendant's choice between two reasonable but conflicting views, even if the court would have made a different choice if the matter were referred to the court de novo.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting Zoltanski v. F.A.A., 372 F.3d 1195, 1200 (10th Cir. 2004)).

II.  THE ALJ'S DECISION (Tr. 22-33).

There is a five-step evaluation process followed in these cases which is described in the ALJ's decision.  (Tr. 23-24). First, it is determined whether the claimant is engaging in substantial gainful activity.  Second, the ALJ decides whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments which are "severe."  At step three, the ALJ decides whether the claimant's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Next, the ALJ determines the claimant's residual functional capacity and then decides whether the claimant has

the residual functional capacity to perform the requirements of his or her past relevant work. Finally, at the last step of the sequential evaluation process, the ALJ determines whether the claimant is able to do any other work considering his or her residual functional capacity, age, education and work experience.

In steps one through four the burden is on the claimant to prove a disability that prevents performance of past relevant work. Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006). At step five, the burden shifts to the Commissioner to show that there are jobs in the economy with the claimant's residual functional capacity. Id.

The ALJ made the following specific findings in his decision. First, plaintiff meets the insured status requirements for Social Security benefits through September 30, 2007. Second, plaintiff did not engage in substantial gainful activity after May 16, 2002, the alleged onset date of disability. Third, plaintiff has the following severe impairments: depression, posttraumatic stress disorder/anxiety disorder and personality disorder not otherwise specified. Fourth, plaintiff does not have an impairment or combination of impairments that meet or medically equal the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Fifth, plaintiff has the residual functional capacity to perform the full range

4

of work at all exertional levels with the following limitations:
he is limited to jobs that consist of simple, routine,
repetitive tasks; he may work in proximity to others, but is
limited to jobs that do not require close cooperation and
interaction with coworkers; he is limited to occasional
interaction and cooperation with the general public; and he
retains the ability to maintain attention and concentration for
two-hour periods at a time, to adapt to changes in the workplace
on a basic level and to accept supervision on a basic level.

The ALJ determined that plaintiff was unable to perform any
past relevant work. But, the ALJ denied plaintiff's
applications for benefits based upon the testimony of a
vocational expert that plaintiff could perform the jobs of a
shuttle spotter, casting machine tender, or burring machine
operator. The ALJ concluded that these jobs exist in
significant numbers in the national economy and that plaintiff
had the capability of performing the jobs from the alleged onset
date of disability through the date of the ALJ's decision.

III.  ADMINISTRATIVE RECORD

Plaintiff's arguments in this matter focus upon an alleged
deterioration in plaintiff's mental health occurring about the
middle of 2012. Plaintiff asserts that the ALJ did not
adequately account for this when he weighed the medical opinions
and plaintiff's credibility. Because chronology is important to

these arguments, the court shall discuss the evidence in the administrative record mostly in chronological order.

A. Function reports

There is a function report from a third party - Bonnie Jo Bennett - dated December 14, 2011.    (Tr. 251-258).    She indicates that plaintiff:  has a short attention span and poor concentration; paces back and forth; suffers panic attacks and mood swings; and is anti-social.  The report further states that plaintiff:  helps play with and feed pets; is able to fix simple meals; and does household chores, such as taking out the trash, vacuuming and cutting grass.  The report also remarks that plaintiff often goes outside and wanders around the yard, and that he watches television.

There are two function reports from plaintiff in the record, one dated December 21, 2011 (Tr. 278-285) and one dated May 9, 2012 (Tr. 302-309).  These reports describe plaintiff as: being depressed; suffering fatigue after sitting and standing; pacing a lot; and having poor concentration or a short attention span.  They indicate that plaintiff:  makes coffee and breakfast for himself; makes other simple meals for later in the day; and does chores such as trash removal, mowing, cleaning his room, and doing laundry. They further record that plaintiff does a little shopping, watches television, and plays video games.  His social activity is noted to be quite limited.

B.  Medical reports

    1. Dr. Hough

Although plaintiff alleges a disability onset date of May 16, 2002, the mental health records in this case do not start much before February 17, 2012 when plaintiff was examined by Dr. George Hough, a psychologist.   This is important because plaintiff's arguments in this case relate to the assessments of his mental health, not his physical health.

The ALJ gave significant weight to Dr. Hough's opinion which is at Tr. 354-359.  Dr. Hough only saw plaintiff once. Dr. Hough noted that plaintiff was living with his ex-wife's parents and a family friend.   According to Dr. Hough, plaintiff: completed light chores around the house and yard maintenance in warm weather; performed activities of daily living independently; can manage his own funds; and played computer games as a hobby.   Plaintiff appeared neat and clean and appropriately dressed.  Plaintiff was cooperative and friendly, spoke intelligibly, had good eye contact, and was able to comprehend and follow simple directions.  He had a low degree of attention and concentration, but his thought processes were intact and he had an average range of intellectual ability. Plaintiff denied any auditory or visual hallucinations. Plaintiff indicated that he was sad and depressed.  Dr. Hough found that plaintiff suffered from social anxiety, low self-

esteem, low energy, and problems with decision making. Plaintiff admitted to only passive suicide feelings over the last 1 and 1/2 years.

Dr. Hough diagnosed plaintiff with: major depression, single episode, chronic, without psychotic features; social anxiety, moderate; anxiety not otherwise stated; and panic disorder with some agoraphobia. He concluded in part that:

> Based on current clinical interview data, [plaintiff] has the ability to carry out simple 1-2 step verbal instructions, maintain adequate work-focused attention, work with ordinary supervision, and complete a work week without interruptions from psychologically based symptoms. Given his social anxiety he will work better alone.
> [Plaintiff] has the ability to relate adequately to supervisors.

(Tr. 359).

## 2. State agency consultants

The ALJ also gave significant weight to the assessments of state agency psychological consultants. The latest assessment was signed July 23, 2012. Each assessment gave "great weight" to Dr. Hough's findings. (Tr. 73 & 100). These assessments found that plaintiff was moderately limited in his ability to understand and remember detailed instructions; otherwise his ability to remember and understand instructions was not significantly limited. (Tr. 74 & 100). They determined that plaintiff was moderately limited in his ability to carry out detailed instructions; otherwise his sustained concentration and

persistence was not significantly limited. (Tr. 74-75 & 101). The assessments indicated that plaintiff was moderately limited in his ability to interact appropriately with the general public, but otherwise his social interaction capabilities were not significantly limited. (Tr. 75 & 101).

### 3.  First hospitalization

On August 28, 2012, plaintiff was admitted to a hospital in Lincoln, Nebraska with acute depression. (Tr. 386 & 396). This was his first psychiatric hospitalization. He was feeling suicidal and hopeless, and suffered anxiety and panic attacks. He described suicidal ideation, but denied any suicide attempts. (Tr. 388). He also described hallucinations. Id. His GAF score was 25. (Tr. 387). Plaintiff was discharged on August 31, 2012. Medication for depression was prescribed. At that time he was considered medically stable with a fair prognosis. (Tr. 384). His GAF score was 40. (Tr. 384). During this time, plaintiff had been living temporarily with his sister and helping to clean out the house of his recently deceased mother.

### 4.  Dr. Oestmann

Plaintiff was examined by Dr. Jerry Oestmann on September 11, 2012. Dr. Oestmann diagnosed plaintiff with major depression and generalized anxiety disorder. (Tr. 420). Dr. Oestmann recorded that: plaintiff's appearance was appropriate; he avoided eye contact; his activity was slowed; he had a

depressed mood and constricted affect; his speech was appropriate; his thought processes were loose; his perception was appropriate; he did not report delusions or hallucinations; his concentration/attention, judgment and insight were poor; but his intellectual functioning was average. (Tr. 419-20). Plaintiff's GAF score was listed as 48. (Tr. 420). Weekly psychotherapy was recommended. (Tr. 421).

The record indicates that Dr. Oestmann conducted a therapy session with plaintiff on October 1, 2012 and noted that plaintiff was very depressed, but lucid. (Tr. 414). Plaintiff could not have additional appointments because he had no means to pay. Id.

On March 27, 2013, several months after his last visit with plaintiff, Dr. Oestmann completed a medical source statement. (Tr. 423-24). The form indicates that plaintiff is moderately limited in functions related to understanding and memory, including the ability to remember and understand all kinds of instructions, locations, and work-like procedures. Dr. Oestmann considered plaintiff markedly limited in his ability: to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform according to a schedule and be punctual; to make simple work-related decisions; and to complete a normal workday and workweek without interruption from psychologically based symptoms. Plaintiff was

also considered markedly limited in his ability to interact with the general public and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Dr. Oestmann further noted that plaintiff was markedly limited in: his ability to respond to changes in the work setting; his ability to travel to an unfamiliar place or use public transportation; and his ability to set realistic goals or make independent plans. He considered plaintiff moderately limited in: carrying out simple instructions; sustaining an ordinary routine without special supervision; working in proximity to others without being distracted by them; asking simple questions or requesting assistance; accepting limitations and responding appropriately to criticism; and being aware of normal hazards and taking appropriate precautions.

### 5. Pawnee Mental Health Services

In mid-February 2013, plaintiff was assessed by a licensed social worker at Pawnee Mental Health. A GAF score of 46 was given. Plaintiff was recorded as having racing thoughts, visual hallucinations, low energy and a depressed mood. (Tr. 447 & 449-50). Plaintiff was also assessed as cooperative, appropriately groomed, and as having fair concentration, average intellectual ability and good judgment and insight. (Tr. 449-450). It was noted that plaintiff had recurrent suicidal ideation without a specific plan. (Tr. 447). A secondary

diagnosis of post-traumatic stress disorder was added to plaintiff's records. (Tr. 447).

### 6. Second hospitalization

In early March 2013, about six months after seeing Dr. Oestmann, plaintiff was admitted to Stormont-Vail West in Topeka, Kansas. His sister was with him and expressed worry concerning plaintiff's safety and the safety of her family. (Tr. 436). Plaintiff reported auditory and visual hallucinations and increased suicidal ideation. (Tr. 454). Plaintiff was sometimes difficult to wake up and reported daily panic attacks. (Tr. 440). He was not attending to personal hygiene and he needed a place to live because he was no longer welcome to live with his sister and her husband. Id. Plaintiff was diagnosed with major depression, recurrent, severe with psychosis and anxiety disorder, not otherwise specified. (Tr. 456). His GAF score was listed at 24. (Tr. 494). When plaintiff was discharged after a few days he reported that his mood was improved and he denied suicidal ideation. (Tr. 455). Plaintiff was scheduled for psychotherapy at Pawnee Mental Health Services following his release. Id. His GAF score on discharge was 50. Id.

### 7. Dr. Grace Thomas

When plaintiff was released from Stormont-Vail West, he began living at a homeless shelter in Manhattan, Kansas. He

12

received care from Dr. Grace Thomas, a psychiatrist at Pawnee Mental Health Services beginning March 14, 2013. She diagnosed plaintiff with major depressive disorder and posttraumatic stress disorder. (Tr. 433). In many respects, she evaluated plaintiff as normal. But, she listed his concentration as "poor," his intellectual ability as "below average," and his GAF score as 25. (Tr. 432-34).

### 8. Further Pawnee Mental Health Services appointments

On March 21, 2013, plaintiff began a series of appointments mostly with Dr. Jane Tippett. She found plaintiff to be lethargic, depressed and distracted, but not a danger to himself or others. (Tr. 540-41). On March 28, 2013, plaintiff again was lethargic, depressed and distracted with obsessive thoughts. (Tr. 539). He also displayed poor personal hygiene. Id. On April 3, 2013, plaintiff appeared less depressed. But, hallucinatory activity was reported in addition to poor concentration and poor personal hygiene. (Tr. 537). On April 10, 2013, Dr. Tippett recorded that plaintiff appeared depressed, and lethargic with poor concentration. On April 17, 2013, plaintiff was observed to be very depressed, indecisive, and lethargic. (Tr. 530-31). Suicidal ideation and hallucinatory activity was also recorded. Id. On April 24, 2013, plaintiff was considered stable, but not sleeping well. (Tr. 528). He exhibited disorganized thought content,

indecisiveness, fatigue and generalized anxiety. (Tr. 529). Plaintiff's next appointment was May 16, 2013. Plaintiff appeared somewhat anxious and depressed. (Tr. 521). He reported visual hallucinations. Id. He also reported suicidal ideation. Id. And, he was observed as indecisive, lethargic, and as having poor eye contact. (Tr. 522). On May 21, 2013, Dr. Thomas conducted a therapy session with plaintiff. She observed that plaintiff was anxious and that he "hears name calling." (Tr. 518). But, Dr. Thomas also found plaintiff's thought to be organized, his perception normal, his sleep fair and his energy fair. (Tr. 518). On June 4, 2013, Dr. Tippett recorded that plaintiff was "somewhat better." (Tr. 516). She observed that he was depressed, with poor concentration and indecisiveness. She reported fatigue, but said plaintiff's anxiety was within normal limits. (Tr. 517). About this time, plaintiff moved from the homeless shelter to an apartment. On June 13, 2013, Dr. Tippett found that plaintiff was stable and looked in better health. (Tr. 514). His hygiene was appropriate, his mood was cheerful and there was no disorder in his thought content or cognition. (Tr. 515). His anxiety was within normal limits and his behavior was also registered as normal. (Tr. 515).

C.  Third-party report from the Manhattan Emergency Shelter

On May 8, 2013, which was approximately the midpoint of plaintiff's stay at the Manhattan homeless shelter, a case manager (Pat Mansker) and client advocate (Donna DeDonder) wrote a letter regarding plaintiff.  The letter states in part:

> Staff observed that [plaintiff] needed a great deal of attention to enable him to follow through with tasks as simple as making phone calls in his own behalf.  He would lurk outside staff offices to get repeated instructions on exactly what to do and how to do it. He would ask exactly what to say and would run back to staff to report results, often being unable to achieve the goal of the phone call . . . Writing notes for him helped a little.  However, it appears that [plaintiff] has a total lack of confidence in himself to do even simple things. . . .

> David tends to spend most all of the time alone and also sleeps much more than appropriate.  He says he has a sleep disturbance and can't quit thinking to allow himself to sleep.  He does not trust others and says in the past he has been talked out of money and food and been taken advantage of in many ways.  He is always anxious and reports symptoms of panic attacks. Observably, he is easily stressed, and often has to have questions repeated as if he is not listening; then, he has difficulty finding a way to explain his answer.  David is so insecure that it appears he would have a hard time relating to coworkers and supervisors and accomplishing even simple tasks without constant supervision.

> David requires help to understand how to complete forms such as applications for housing.  He has a lot of vague physical complaints such as his back hurting, being fatigued, having his toes go numb and being unable to walk very far.  He says he continues to become dizzy especially when climbing stairs and that he is fearful of even standing on a step stool.

(Tr. 501-02).

15

D. Plaintiff's testimony

As mentioned, plaintiff testified before the ALJ on May 22, 2013.  He stated that he had been unable to work because of mental problems which cause everything to shut down with any little stress; also, he said he could not sit or stand for very long.  (Tr. 40).  He reported that he had suicidal thoughts twice a week.  (Tr. 51).  He also mentioned visual hallucinations, auditory hallucinations and that he had a bit of vertigo.  (Tr. 41 & 44).  He complained of paranoia and lack of sleep.  (Tr. 42).  Plaintiff testified that he was able to take care of his hygiene, but that he was forgetful about a lot of things.  (Tr. 46 & 49).  Plaintiff was seeing a psychologist on a weekly basis at that time and he testified that she was very helpful.  (Tr. 47).  He testified that he is dyslexic and needs help filling out forms, although his reading is fine.  (Tr. 49).  Plaintiff said that he did chores at the homeless shelter, such as dumping trash and sweeping and mopping floors.  He said most of the chores took five or ten minutes.  (Tr. 50).

IV.  IN ASSESSING PLAINTIFF'S CLAIM FOR SUPPLEMENTAL SECURITY INCOME BENEFITS, THE ALJ DID NOT REASONABLY ASSESS DOCTORS' OPINIONS IN LIGHT OF EVIDENCE WHICH AROSE SUBSEQUENT TO THOSE OPINIONS.

Plaintiff makes two arguments to reverse the decision to deny benefits.  Both arguments relate to plaintiff's mental health status in 2012 and after.  First, plaintiff contends that

16

substantial evidence does not support the weight the ALJ assigned to certain doctor's opinions because those opinions relied upon outdated information.   Second, plaintiff contends that the ALJ erred in his credibility determination again because he relied upon outdated information.   The court shall only discuss the first argument in detail.

An ALJ has the responsibility of weighing all medical opinions in the record and to discuss the weight assigned to each opinion.   20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).   One factor for consideration is consistency with the record as a whole.   §§ 404.1527(c)(4); 416.927(c)(4). Another factor is the extent to which a medical source is familiar with the other information in the case record.   §§ 404.1527(c)(6); 416.927(c)(6).   For nonexamining sources, an ALJ may consider the degree to which their opinions consider all of the pertinent evidence in a claim.   §§ 404.1527(c)(3); 416.927(c)(3).   To the extent there is conflict between medical opinions, the ALJ must explain the basis for adopting one and rejecting another with reference to the factors governing the evaluation of medical-source opinions.   Reveteriano v. Astrue, 490 Fed.Appx. 945, 947 (10th Cir. 2012).   In making such an explanation, an ALJ must not "pick and choose among medical reports, using portions of the evidence favorable to his

position while ignoring other evidence."   Keyes-Zachary v. Astrue, 695 F.3d 1156, 1166 (10th Cir. 2012).

In this instance, the ALJ gave "significant weight" to three opinions: the opinion from Dr. Hough and the opinions from the two nonexamining state agency consultants (who also gave "great weight" to Dr. Hough's opinion).   But, none of those opinions took into account later arising medical evidence which arguably reflected a deterioration of plaintiff's condition. Here, after the medical source opinions relied upon by the ALJ were given, plaintiff was hospitalized twice for depression and anxiety; he reported visual and auditory hallucinations on several occasions; he was recommended for and eventually engaged in weekly therapy sessions; and a diagnosis of posttraumatic stress disorder was added to his case.   In addition, a third-party report was written which indicated that plaintiff: slept excessively; did not trust others; was always anxious and easily stressed; seemingly did not listen to questions; had difficulty explaining his answers to questions; and appeared to have a hard time accomplishing even simple tasks without constant supervision.[1]

---

[1] The ALJ discounts this report from the Manhattan homeless shelter because plaintiff had only stayed there for two months and because the report was "nearly identical" to plaintiff's "subjective report and therefore cumulative." (Tr. 31-32).   Neither point is convincing to the court.   Two months seems to be enough time to make some reliable observations concerning someone's behavior.   As for the ALJ's latter point, the court does not know what "subjective report" the ALJ has in mind.   Moreover, it seems more

The opinions to which the ALJ gave significant weight were rendered prior to, and therefore could not account for, most of the evidence in the administrative record regarding plaintiff's mental health.  This is of concern for at least three reasons relating to plaintiff's argument that the ALJ relied upon stale evidence.  First, as mentioned, according to the regulations medical opinions are evaluated to some degree upon their access to, familiarity with and consistency with the record as a whole. Second, the ALJ made a judgment that the opinions which he relied upon are consistent with subsequent medical records. This appears to be a medical judgment to some degree as it suggests that the doctors would reach the same conclusions if they reviewed the subsequent records.  Of course, ALJs are not supposed to make medical judgments.  Winfrey v. Chater, 92 F.3d 1017, 1022 (10th Cir. 1996).

Finally, as argued by plaintiff, there is evidence that plaintiff's condition deteriorated after the doctors gave the opinions relied upon by the ALJ, and therefore the ALJ's conclusion that the opinions are consistent with subsequent medical records may not be reasonable.  Plaintiff cites Chapo v. Astrue, 682 F.3d 1285, 1293 (10th Cir. 2012) and cases which have discussed Chapo to illustrate the potential significance of access to updated medical records.  In Chapo, the court found it

reasonable to consider any similarity as being relevant and corroborative as opposed to cumulative and unimportant.

troubling that the ALJ relied upon an examining consultant who referenced 20-month old medical records in support of his opinion when a more recent medical record (an MRI) provided objective evidence to the contrary.   The court suggested that the consultant's opinion might be stale and encouraged the ALJ on remand to obtain an updated examination or report.   In <u>Price v. Colvin</u>, 2014 WL 943101 *4 (D.Kan. 3/11/2014), the court stated similar concerns when a nonexamining medical source relied upon by an ALJ did not have more recent and perhaps contradictory hospital records and medical evaluations when formulating his opinion. The court remarked:

> The court is concerned with the necessarily incremental effect of each individual report or opinion by a source on the aggregate assessment of the evidentiary record, and, in particular, on the evaluation of reports and opinions of other medical treating or examining sources, and the need for the ALJ to take this into consideration.

<u>Id.</u>   See also <u>Jaramillo v. Colvin</u>, 576 Fed.Appx. 870, 874 (10th Cir. 8/27/2014)(noting in discussing two mental examinations that it was significant that the more recent mental examination placed greater limitations upon a claimant's capabilities).

The ALJ emphasized that plaintiff's condition was improved each time he was discharged from the hospital.   The ALJ also highlighted some of the more positive remarks in various medical reports.   These remarks include comments to the effect that plaintiff was:   cooperative, in a good mood, or more stable; not

having hallucinations; appropriately groomed; made good eye contact; and had fair concentration, average intellectual capacity, or fair judgment and insight.  These comments should not be ignored.  But, it would be unreasonable to say that they nullify the many negative assessments of plaintiff's depression, concentration, and anxiety.  The ALJ's effort to weigh the medical opinions in this case appears to rely too greatly upon impermissible picking and choosing of positive details from medical reports in order to conclude that certain medical opinions are consistent with subsequent medical records.

The ALJ also gave "significant weight" to Dr. Hough's opinion because he considered it consistent with plaintiff's reported daily activities.  (Tr. 31).  The ALJ mentioned the following activities of daily living in his opinion:  household chores like taking out the trash, vacuuming, mopping, mowing and laundry; cooking or fixing simple meals; taking care of his hygiene; shopping once a week; using public transportation; paying bills; counting change; using a checkbook; and handling a savings account; going to church twice a month; and playing computer games.  (Tr. 30).  The court does not believe plaintiff's activities of daily living provide sufficient support for the weight the ALJ gave to Dr. Hough's opinion.  The ALJ did not appear to take into account that the chores plaintiff did took only a short time (Tr. 50, 253, 280); that by

and large plaintiff was not considered a social person (Tr. 354, 255-56, 505); and that, as of May 2013, plaintiff needed a "great deal of attention" to enable him to follow through with simple tasks. (Tr. 501). The ALJ's failure to consider such "nuances" in the reports of daily activities and the possible deterioration in plaintiff's condition, diminishes the weight that can be given to Dr. Hough's report, and by extension, the report of the state agency consultants. See Wells v. Colvin, 727 F.3d 1061, 1070 (10th Cir. 2013)(criticizing an ALJ for ignoring "nuance" in the descriptions of daily activities).

In summary, having considered the reasons given by the ALJ for his assessment of the opinions of Dr. Hough and the state agency consultants, the court finds that the ALJ's analysis did not conform with legal standards requiring the consideration of such opinions in light of the entire medical record, including subsequent medical evidence.

V. CONCLUSION

In conclusion, the court agrees with plaintiff that the ALJ failed to correctly weigh the doctors' opinions in this case largely because the ALJ failed to properly consider those opinions in light of subsequent evidence which could reasonably be construed as showing a deterioration in plaintiff's condition. The court believes this provides sufficient grounds to reverse and remand the decision to deny plaintiff's

application for supplemental security income benefits. The court further finds that plaintiff's arguments to reverse the decision to deny benefits do not provide grounds to reverse or remand the decision to deny plaintiff's application for disability insurance benefits. Therefore, the court shall direct that judgment be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) affirming defendant's decision to deny plaintiff's application for disability insurance benefits and reversing the decision to deny plaintiff's application for supplemental security income benefits and that this matter be remanded for further proceedings in accordance with this memorandum and order.

**IT IS SO ORDERED.**

**DATED THIS 2nd DAY OF JUNE, 2015.**

**s/RICHARD D. ROGERS**
**RICHARD D. ROGERS**
**UNITED STATES DISTRICT JUDGE**